UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. ) |
| RICHARD DUNCAN, | ) JURY TRIAL DEMANDED ) |
| Defendant. | ) ) ) |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against defendant Richard Duncan and demands a jury trial.

## PRELIMINARY STATEMENT

1.  This enforcement action involves a fraud by Richard Duncan, an investment adviser who lives in East Longmeadow, Massachusetts. From late 2016 until the fall of 2018, Duncan solicited investments in a purported investment opportunity in Turkey that was actually a scam. The so-called opportunity consisted of sending funds to Turkey based on an elaborate hoax. Duncan told his clients and various third parties that a woman living in Turkey expected to inherit as much as $6 million from her deceased father, and that he would be able to manage the $6 million if he provided the woman with money for legal expenses. On some occasions, he referred to the woman as his girlfriend or fiancée. Duncan steered at least two elderly retail investors to "invest" in this illusory jackpot, promising them a return of as much as 100% if they helped to secure the release of the funds. One of his longtime clients provided approximately $250,000; another client put in $28,100. The money was sent to several people in Turkey and

the United States who were supposedly helping the woman in Turkey. Duncan's clients have not received any of the promised returns on their investment. Instead, their money has been lost to this international scam.

2. As an investment adviser, Duncan owed his advisory clients an affirmative duty of the utmost good faith, and he was required to make full and fair disclosure of all material facts and to employ reasonable care to avoid misleading his clients. Leaving aside the facial implausibility of the story, Duncan failed to obtain any documentation establishing the identity of the woman in Turkey and confirming the existence of legal proceedings involving the estate of the woman's father. He failed to obtain any documentation memorializing any financial interest that his clients received in the purported estate. He also ignored – and failed to inform his clients about – several bright red flags, including warnings from two banks that the Turkish investment opportunity was probably a scam.

3. Through the activities alleged in this Complaint, Duncan has engaged in fraudulent or deceptive conduct with respect to investment advisory clients, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§80b-6(1), (2)].

4. The Commission seeks: (a) a permanent injunction prohibiting Duncan from further violations of the relevant provisions of the federal securities laws; (b) disgorgement of Duncan's ill-gotten gains, plus prejudgment interest; and (c) a civil penalty due to the egregious nature of Duncan's violations.

## JURISDICTION AND VENUE

5. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)].

6.     This Court has jurisdiction over this action pursuant to Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§80b-9(d), 80b-9(e), 80b-14].

7.     Venue is proper in this District because, at all relevant times, Duncan lived here and the conduct in question occurred here.

8.     In connection with the conduct alleged in this Complaint, Duncan directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

9.     Duncan's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANT

10.    **Richard Duncan**, age 71, lives in East Longmeadow, Massachusetts.  Since at least 1989, he has been an investment advisory representative associated with various investment advisory firms.  Prior to April 2017, he was associated with an investment advisory firm in East Longmeadow.  Between April 2017 and April 2019, he was associated with an investment advisory firm based in Iowa.  On April 4, 2019, the Iowa firm terminated its relationship with Duncan after being informed that he had solicited investments from clients for the purported Turkish investment scheme.

## FACTUAL ALLEGATIONS

11.    In 2016, an acquaintance told Duncan about an American woman purportedly living in Turkey who supposedly needed money to pay attorneys in that country who supposedly were working to secure the release of what was claimed to be the $6 million estate of the woman's father.  Duncan failed to obtain any documentation establishing the identity of the

woman in Turkey or confirming the existence of any legal proceedings involving the estate of the woman's father.  Nevertheless, Duncan decided to send money to people who were supposedly helping her.

12.  In September 2016, Duncan went to a bank where he had a personal account (hereafter, "Bank #1").  He stated that he wanted to wire $10,000 to an attorney in Turkey who was helping him to obtain the release of approximately $600,000 from the estate of his fiancée's father.  When bank personnel warned Duncan that the transaction appeared to be a common scam, he responded that he knew what he was doing and had a great deal of financial experience.  However, Duncan did not have the correct wiring instructions for the attorney in Turkey, so the bank was unable to wire the funds.  Despite the warning from Bank #1, Duncan proceeded to withdraw $10,000 in cash, so that he could purchase four money orders to send to the attorney.

13.  In late 2016, Duncan approached a long-time friend and retail client (hereafter, "Client #1"), who is 70 years old.  Duncan stated that if Client #1 provided money to assist a woman in Turkey in getting control of her father's estate, Client #1 would receive a 100% return on his investment.  Even though Duncan had told Bank #1 that the woman in Turkey was his fiancée, he did not disclose that conflict of interest to Client #1.  Nor did he disclose to Client #1 that a bank had warned him that the transaction was probably a scam.  In addition, Duncan failed to obtain any documentation that would memorialize any financial interest that Client #1 would receive in the purported estate.

14.  In January 2017, Client #1 provided Duncan with $16,000 in cash to be used for the purported Turkish investment.  Duncan deposited the money in one of his personal accounts at a second bank (hereafter, "Bank #2").  When Duncan tried to wire money to a person in Turkey, bank personnel questioned him about the suspicious nature of the transaction.  Duncan

stated that he was expecting an incoming wire of 6 million at some point in the next two weeks. Despite the warning from Bank #2, Duncan proceeded to wire $15,800 to the person in Turkey.

15. Between January and March 2017, Duncan wired a total of approximately $86,600 from his account at Bank #2 to a person in Turkey. When he made the final wire transfer, Duncan told Bank #2 employees that it was the last wire he would need to send in order to settle a $6 million estate.

16. In late March 2017, Duncan went to Bank #1 and asked to wire money from his personal account to a person in Turkey. Bank #1 personnel told Duncan that, because the information about the payee was similar to the information he had provided in September 2016, it was possible that the transaction was fraudulent. Despite this second warning from Bank #1, Duncan proceeded to wire $14,400 to the person in Turkey. Two weeks later, Duncan wired an additional $6,500 to the same person in Turkey.

17. Between January and April 2017, Duncan thus wired a total of approximately $107,500 to persons in Turkey. During the same period, Client #1 provided Duncan with a total of at least $100,000 to be used for the supposed Turkish investment.

18. Even though he had been warned by two banks that the purported Turkish investment was probably a scam, Duncan continued to solicit money from Client #1. He gave Client #1 various excuses for the delay in the release of the funds and the subsequent payout to Client #1. On one occasion, Duncan even claimed that $6 million in cash from the estate of the woman's father was on its way to the United States by boat, and that the boat had unexpectedly been diverted to Hamburg, Germany.

19. Between April 2017 and January 2018, Client #1 wired a total of $132,840 directly to two people in Turkey whom Duncan had identified.

20.     Between October and December 2017, Duncan used MoneyGram to send a total of $8,250 to three people in Turkey. It appears that Client #1 provided Duncan with most, if not all, of the money that Duncan sent through MoneyGram.

21.     In February 2018, Duncan wired $4,250 to a business associated with a person living in Texas who was supposedly helping the woman in Turkey.

22.     Between April and October 2018, Duncan used cashier's checks to send a total of $36,950 to the person in Texas who was supposedly helping the woman in Turkey.

23.     In June 2018, Client #1 sent $3,000 to the same person in Texas.

24.     In short, during the period between September 2016 and October 2018, Duncan sent at least $167,025 to several people who were supposedly helping the woman in Turkey. Apart from the initial transfer of $10,000 of his own money in September 2016, most of the money that Duncan sent was supplied by Client #1. Client #1 also sent a total of at least $135,840 directly to people in Turkey and the United States whom Duncan had identified. At no point did Duncan disclose to Client #1 that he had told a bank that the woman was his fiancée or that two banks had warned him that the Turkish investment was probably a scam. Duncan failed to obtain any documentation memorializing the financial interest that Client #1 supposedly received by reason of his investments.

25.     In addition, between May and October 2018, a total of $28,100 was paid from an account belonging to another of Duncan's long-time advisory clients (hereafter, "Client #2") to the person in Texas who was supposedly helping the woman in Turkey. Duncan serves as a trustee for Client #2, who is 72 years old.

26.     In April 2019, personnel from the Commission's Office of Compliance Inspections and Examinations ("OCIE") conducted an examination of Duncan's office located in

his home in East Longmeadow, Massachusetts. Duncan told the OCIE staff that he anticipated that an attorney in Turkey would hire him to manage the funds in the estate of his girlfriend's father. Duncan also told the OCIE staff that he had personally contributed $10,000 to help his girlfriend secure the release of her father's estate.

### FIRST CLAIM FOR RELIEF
### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

27. The Commission repeats and incorporates by reference the allegations in paragraphs 1-26 above.

28. At all relevant times, Duncan was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

29. Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2)] provide that it is unlawful for an investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (1) to employ any device, scheme, or artifice to defraud a client or prospective client; or (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client.

30. As a result of the misconduct alleged above, Duncan has violated and, unless enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act.

### PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining Duncan, as well as his agents, servants, employees, attorneys, and other persons in active concert or participation with them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1)];

  B. Require Duncan to disgorge his ill-gotten gains, plus prejudgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

  C. Order Duncan to pay an appropriate civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

  D. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

  E. Award such other and further relief as the Court deems just and proper.

        Respectfully submitted,

        /s/  Frank C. Huntington
        Frank C. Huntington  (Mass. Bar No. 544045)
         Senior Trial Counsel
        Susan Cooke Anderson  (D.C. Bar No. 978173)
         Senior Enforcement Counsel
        Martin F. Healey  (Mass. Bar No. 227550)
         Regional Trial Counsel
        Attorneys for Plaintiff
        **SECURITIES AND EXCHANGE COMMISSION**
        Boston Regional Office
        33 Arch Street
        Boston, MA  02110
        (617) 573-8960  (Huntington direct)
        (617) 573-4590  (fax)
        huntingtonf@sec.gov  (Huntington email)

Dated:  August 12, 2019