UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-11735-KAR |
| | ) | |
| RICHARD DUNCAN, | ) | |
| | ) | |
| Defendant. | ) | |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

ROBERTSON, U.S.M.J.

I.      INTRODUCTION

The Securities and Exchange Commission ("SEC") brought a civil enforcement action against Richard Duncan ("Defendant"), a former registered investment adviser, for engaging in fraudulent and deceptive conduct in violation of §§ 206(1) and 206(2) ("Section 206(1)" and "Section 206(2)") of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6 (1), (2).  The SEC claimed that Defendant violated the Advisers Act by soliciting his advisory clients' investments in an advance-fee scam involving an alleged woman in Turkey and her purported six-million-dollar inheritance ("Turkish investment" or "Turkish deal").  The parties have consented to this court's jurisdiction (Dkt. No. 43).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  After conducting a bench trial at which Defendant proceeded *pro se* and reviewing the trial testimony, exhibits, and the parties' post-trial submissions, the court finds that Defendant violated Sections 206(1) and 206(2) of the Advisers Act.

II.      BENCH TRIAL

1

Following a bench trial, "the court shall find the facts specifically and state separately its conclusions of law thereon," before entering judgment.  Fed. R. Civ. P. 52(a); *see also Cafe La France, Inc. v. Schneider Securities, Inc.,* 281 F. Supp. 2d 361, 363 (D.R.I. 2003).  The court weighs the credibility of the witnesses in making its factual findings.  *See* Fed. R. Civ. P. 52(a); *see also Gautieri v. United States,* 167 F. Supp. 2d 207, 209 (D.R.I. 2001).

III.   FINDINGS OF FACT

A.   Defendant's Background

Defendant began his career as an investment adviser in September 1972 (Tr. I at 143).[1] He worked at Bradway Financial ("Bradway") before joining Ausdal Financial Partners, Inc. ("Ausdal") in April 2017 (Tr. I. at 143-44).  Both firms were registered with the SEC.  As a registered investment adviser, Defendant had fiduciary obligations to his clients that were mandated by the SEC and by Ausdal's Compliance Policies & Procedures Manual and Code of Ethics (Tr. I at 10-13; Exhibit 2).  Defendant owed his clients a duty of care, which required him to act in his clients' best interest at all times, and a duty of loyalty, which meant that he was required to put his clients' interests first and either avoid conflicts of interest or make full and fair disclosure of all material conflicts to his clients, the public, and his employer (Tr. I at 13-14, 93-94).

B.   2016:  Defendant's Turkish Investments

During the summer of 2016 while Defendant was waiting to be ferried to his sail boat in Newport, Rhode Island, he provided his contact information to two men whose names he did not know (Tr. I at 46, 118).  Thereafter, Defendant received an e-mail message from someone

---

[1] Citations to "Tr. I," "Tr. II," and "Tr. III" refer to the trial transcripts of March 29, March 30, and April 26, 2021 respectively.  Citations preserve the transcripts' original pagination.

claiming to be a woman in Turkey named Janet Marck who had allegedly inherited $6 million dollars in United States currency from her father (Tr. I at 116-17). The money was being held by AKBank in Turkey (Tr. I at 116-17). Marck represented that she needed Defendant's financial assistance to move from Turkey to the United States and to transfer her inheritance from AKBank (Tr. I at 46). In return for Defendant's monetary contributions, Marck told Defendant that he would manage her $6 million inheritance after it arrived in the United States (Tr. I at 46, 155). Because Defendant's compensation as an investment adviser was based on the value of the assets he managed, he found the possibility of managing Marck's funds to be "pretty attractive" (Tr. I at 126-27, 145).

Defendant and the person claiming to be Marck continued to exchange e-mail communications during the summer of 2016 (Tr. I at 120). They never spoke by telephone or in person (Tr. I at 174). Defendant found Marck to be "extremely bright," "very fun," and "a pretty solid person" (Tr. I at 120, 175). Defendant developed "feelings" for Marck in the fall of 2016, shortly after they began exchanging e-mails, and he hoped that their romantic relationship would develop further when she reached the United States (Tr. I at 120-21; Tr. II at 38).

An August 25, 2016 e-mail message from Marck to Defendant included a copy of a document from the "High Court of Justice, 12-13 Taylor Road, Istanbul, Turkey" which allegedly granted Defendant the power of attorney over Marck's "family treasure" (Exhibit 60). By granting Defendant the power of attorney, Marck purportedly "empowered [Defendant] to be the custodian of the said fund when it is finally cleared from the AKBank to his bank account in the United States of America" (Exhibit 60). Defendant did not conduct an internet search of the term "High Court of Justice" (Tr. II at 25). If he had conducted such a query, he would have found that the court did not exist in Turkey (Tr. II at 25).

The next day, August 26, 2016, Defendant received an e-mail message from "Barrister Richard Morgan" of Istanbul who Defendant believed was Marck's family's attorney (Tr. II at 18; Exhibit 62). Defendant thought that Morgan obtained his contact information from the two men he met in Newport (Tr. I at 118). Morgan's e-mail address was richardmorganchambers@mail.com (Exhibit 62). Notwithstanding the unusual email suffix of "@mail.com" and the misspelling of "Practitoners" in the e-mail messages that Defendant received from Morgan on August 26 and 27, 2016 and January 11 and March 12, 2017, Defendant did not search the internet for "Barrister Richard Morgan" or his alleged law firm, "Morgan & Co. Legal Practitioners" (Tr. II at 18-19, 22; Exhibits 52, 54, 62, 63). Consequently, Defendant was unaware that internet searches of "Barrister Richard Morgan" and "Richard Morgan Chambers" warned of a scam associated with those names and that there was no internet record of a "Morgan & Co." law firm in Istanbul (Tr. II at 20). Morgan never answered Defendant's phone calls during 2016 and 2017 (Tr. I at 176). The court does not credit Defendant's testimony that Morgan answers his calls now (Tr. I at 175).

Morgan's August 27, 2016, e-mail to Defendant indicated that Defendant was required to pay $19,400 for an "insurance clearance certificate" as the "last stage of the whole legal procedure" to move Marck's inheritance from AKBank to Defendant's account in the United States (Exhibit 63). Morgan directed Defendant to transfer the funds "immediately" (Exhibit 63).

Defendant did the "necessary soul searching" and decided, based on his e-mail exchanges with Marck, that he could trust her (Tr. I at 168). He did not make inquiries about her or her assets (Tr. I at 173, 175). Instead, he relied on an account statement purportedly e-mailed to him from AKBank in Istanbul as proof that Marck had $8 million in an AKBank account in June

2017 (Tr. I at 173; Exhibit 53 at 2).  That statement was signed by "Woodrow Wilson, Director of International Wire Transfer" (Exhibit 53 at 2).

Defendant began sending his personal funds to Turkey in August or September 2016 (Tr. II at 32, 71; Tr. III at 39).  Notwithstanding Berkshire Bank's warning of a potential fraud when Defendant made the first transfer to Turkey from his Berkshire Bank account, he continued sending money to purported Turkish parties thereafter (Tr. II at 16-17, 71; Tr. III at 39).

On September 22, 2016, Defendant e-mailed AKBank in Turkey indicating that he had the power of attorney and asking for instructions on how to move Marck's $6 million dollar inheritance to his TD Ameritrade account (Exhibit 64).  Defendant contacted AKBank again on October 2, 2016 because he had not received a response to his earlier e-mail (Exhibit 65).  On November 8, 2016, Defendant received an e-mail message from "Philip Longman" of AKBank's "International Banking and Remittance Department" with an e-mail address of akbankintremittancedept@email.com (Exhibit 68).  Defendant did not look up the e-mail address on the message (Tr. II at 14).  If he had inquired, he would have learned that AKBank's actual employee e-mail addresses ended in the suffix "@akbank.com" (Tr. II at 14).

The November 8, 2016 message that Defendant received from Longman indicated that Defendant had not wired sufficient funds to transfer Marck's money to his Bank of America account (Exhibit 68).  Defendant's e-mail messages to AKBank and Longman on November 23, 2016 and December 13 and 15, 2016 indicated that Defendant had provided a total of $15,000 to Marck and Morgan for the "transfer charge" but he had not received a promised payment of $500,000 from AKBank and had not heard from Longman "as usual" (Tr. II at 27-29; Exhibits 56, 69, 70).  I do not credit Defendant's trial testimony that he and Longman spoke by phone when they first exchanged e-mail communications (Tr. I at 176-77, 179).

Defendant's financial records indicate that he sent at least $32,000 to Turkey via wire transfers and MoneyGram transactions between August and December 2016 (Tr. II at 71; Tr. III at 39).  He received nothing in return (Tr. II at 17-18).

C.     2017:  Robert Greeley's Turkish Investments

On January 6, 2017, Longman of AKBank notified Defendant that it would cost an additional $15,800 for payment of an "Internal Revenue Tax" that Longman represented was "the very last cost to have the inheritance funds transferred" (Exhibit 51).  AKBank's website did not list a bank branch at the address displayed on the e-mail message (Tr. II at 14-15; Exhibit 51).  In response to Longman's message, Defendant noted that the "initial agreement" indicated that he would pay an $8,000 transfer fee and would receive $500,000 in return (Tr. II at 16-17; Exhibit 51).  In fact, he had paid $15,000, but he had not received any money in return for his payments (Tr. II at 16-17; Exhibit 51).  Defendant indicated that "the truthfulness that we have been dealing with is problematic for me" and that he "need[ed] to stop being confused" about the money he kept sending to Turkey without receiving anything in return (Tr. III at 48-49; Exhibit 51).

By the beginning of January 2017, Marck claimed that she needed more than the $2,000 that Defendant had in his personal investment and bank accounts so that she could travel to the United States with her inheritance (Tr. II at 36; Tr. III at 52, 53).  Prompted by Marck's suggestion that he turn to friends, Defendant asked his long-time friend and investment advisory client, Robert Greeley, to invest in the Turkish deal (Tr. II at 15, 36, 108; Exhibit 45).  At that point, Defendant's due diligence related to the investment consisted of the e-mail messages that he had exchanged with Marck, Morgan, and Longman (Tr. I at 174).  Greeley testified that he understood that the Turkish deal was a "high risk investment," but Greeley "thought highly" of

6

Defendant and trusted Defendant to act in Greeley's best interests (Tr. II at 112, 120).  Defendant

told Greeley that he had invested $200,000 in the Turkish arrangement, when, in fact, he had sent

less than $50,000 to Turkey by January 2017 (Tr. II at 42; Tr. III at 40).  Defendant did not

disclose that he had "feelings" for Marck when he recommended that Greeley invest in the

Turkish deal (Tr. II at 38-39).

On January 11, 2017, five days after Longman's request for $15,800, Greeley withdrew

$16,000 in cash from his bank account, Defendant deposited $15,800 in cash into his Bank of

America account, then wired that amount to "Allen Andy" at AKBank in Istanbul (Tr. III at 43-

49, 51-52; Exhibits 12A, 51).  On January 25, 2017, Greeley withdrew another $21,000 from his

bank account, Defendant deposited that amount into his account, and wired it to "Allen Andy" in

Turkey (Tr. III at 55-59; Exhibit 12B).

On March 12, 2017, Morgan asked Defendant for an additional $18,000 "transfer charge"

for Marck's inheritance (Tr. II at 21-22; Exhibit 54).  Defendant claimed that he was "pretty

angry" at that point and was looking for a way out of the Turkish deal (Tr. II at 22).  However,

on April 10, 2017, Greeley withdrew $6,500 in cash from his United Bank home equity account

and Defendant deposited that amount into his Berkshire Bank account (Tr. III at 71-72, 75-76;

Exhibit 72).  When Defendant attempted to wire those funds to "Mercy Stone" in Istanbul on the

date of his deposit, the bank recalled the wire transfer because "Mercy Stone" was associated

with another fraud case being investigated by the bank (Tr. III at 15, 76-79).  Beth Dubuque, a

fraud investigator for Berkshire Bank, warned Defendant that another customer who had sent

money to "Mercy Stone" was the victim of a scam (Tr. III at 15-16).  Defendant insisted that the

money be wired (Tr. III at 16).  Before the bank transmitted the funds, they required Defendant

to sign a note indicating that the bank had advised him of "possible fraudulent activity," but he

chose to wire the money anyway (Tr. III at 17-18, 73, 76-77, 79-80; Exhibit 44).  Bank of America also warned Defendant of fraud (Tr. II at 72-73, 76).

It was apparent from Greeley's trial testimony that he wanted to protect Defendant (Tr. II at 110).  He testified that he was unable to recall whether Defendant told him about the banks' fraud warnings (Tr. II at 112).  During Greeley's deposition, however, he testified that he did not remember Defendant informing him about the fraud warnings (Tr. II at 113).  Defendant's trial testimony that he was "sure" he disclosed the banks' warnings to Greeley was inconsistent with his deposition testimony that he did not remember if he notified Greeley (Tr. II at 79-81; Exhibit 71).  In these circumstances, I find that Defendant did not disclose the fraud warnings to Greeley.

Defendant joined Ausdal in April 2017 (Tr. I at 22-24; Exhibit 3).  In connection with joining Ausdal, he was required to disclose any outside business activities in which he was currently engaged (Tr. I at 19, 73-74).  On Ausdal's Pre-Transition Survey, Defendant indicated that he had no "alternative investments" (Tr. I at 74; Exhibit 1 at 3).  Ausdal's Compliance Policies & Procedures Manual, which included its written Code of Ethics, prohibited Defendant "from engaging in outside [business] activities involving clients or potential clients, relating to the business of [Ausdal], or conflicting with or having the appearance of conflicting with the interests of [Ausdal] or its clients without the prior written approval of [his] Designated Supervisor" (Exhibit 2 at 27).  The Registered Representative Agreement that Defendant and Ausdal executed on April 20, 2017 indicated that Defendant agreed to comply with rules, regulations, and statutes, including the Advisers Act, and to become familiar with and abide by Ausdal's compliance manual and standards of conduct (Tr. I at 24-26; Exhibit 3 at 2).  Defendant's Pre-Transition Survey indicated that he had $6 million dollars of assets under management and "expect[ed] another [$6 million] to be transferred to [him] shortly" (Tr. I at 75-

76; Exhibit 1 at 4).  Defendant and his Ausdal supervisor, Robert DeVita, discussed the possibility of Ausdal increasing Defendant's compensation if he doubled the amount of assets under management in his advisory accounts (Tr. I at 77).

Defendant signed an Ausdal form as the "investment advisor representative" when Greeley opened an investment account with Ausdal on April 5, 2017 and Greeley named Ausdal as his "investment advisor" and Defendant as the "primary contact" when he transferred custody of his assets to TD Ameritrade in May 2017 (Tr. I at 26-27; Exhibit 45).  There is no doubt that Greeley remained Defendant's investment advisory client after Defendant moved from Bradway to Ausdal.

Greeley's and Defendant's financial records show that throughout 2017, Greeley continued to send money to parties in Turkey either directly, or through Defendant, or via MoneyGram (Tr. III at 56; Exhibits 7A, 12B).  Some of Greeley's funds that went to Turkey originated from his TD Ameritrade custodial account (Tr. III at 62-67; Exhibits 17, 19).  In total, Greeley sent approximately $250,000 to Turkey and received nothing in return (Tr. II at 18; Tr. III at 70, 115; Exhibit 7A).

Defendant directed some of Greeley's funds to the supposed costs of shipping the $6 million to the United States, including $90,000 for customs fees and $35,000 for a security detail to guard the money (Tr. I at 130-31).  According to Defendant, Marck's attorney and family friend arranged to ship the money because they were unable to wire the money from AKBank to Defendant (Tr. I at 127).  Defendant testified that they chartered a cargo ship to transport a two-foot by four-foot package that contained Marck's $6 million in cash (Tr. I at 128-30).  According to Defendant, the ship sailed from Istanbul without incident until it reached the Strait of Gibraltar where it encountered a "mechanical issue" (Tr. I at 136).  It allegedly traveled north to Hamburg,

Germany where it remained for the winter (Tr. I at 136).  Winter storage cost $18,000 and an additional $40,000 was needed to rent a larger ship because the first ship's engine needed repair (Tr. I at 137).  The second ship left Hamburg bound for Boston, but veered off course and went south, down the coast of Africa (Tr. I at 138).  From there, it allegedly sailed through the Caribbean Sea to the Panama Canal and on to Acapulco, Mexico (Tr. I at 138).  After spending seven months in Acapulco, the ship purportedly headed back toward the Panama Canal, but broke down right before it reached the canal and there were no spare parts on board (Tr. I at 138-39).  The ship was towed to Costa Rica where $45,000 was required to rent a third cargo ship (Tr. I at 139-40).  From Costa Rica, the ship went to Nicaragua where a fourth boat was acquired (Tr. I at 140-41).  At the time of trial, that boat was allegedly in the Bahamas and Defendant was not sure whether or when Marck's money would reach Boston (Tr. I at 141-42).  Defendant's brief, filed on May 27, 2021, represents that, for a reasonable price, the money was placed under the protection of a new security team and had reached the Everglades (Dkt. No. 64 at 3).

D.    2018:  Stephen D. Trepp's Turkish Investments

As Greeley's contributions to the Turkish investment declined throughout 2017, Defendant turned to another long-time friend, Stephen D. Trepp (Tr. I at 162; Tr. III at 7, 81).  In 2017, Trepp's father died and left Trepp $230,000 in trust (Tr. I at 162).  Defendant was named a co-trustee of the Trepp Family Trust (Tr. I at 162-63; Exhibit 22).  Defendant became Trepp's investment advisor; TD Ameritrade was the custodian of the Trepp trust funds (Tr. I at 161-62; Exhibit 23).  Trepp was disabled by health problems (Tr. II at 59).  The purpose of the trust was to preserve the assets for Trepp's living expenses in the form of a modest apartment and food and clothing, and for support for his daughter, Amber Vigneault, who suffered from addiction, and

for his minor grandson (Tr. I at 35; Exhibit 24).  Defendant knew that Trepp was of diminished capacity (Exhibit 4 at 3).

Defendant's role as an investment advisor to the Trepp Family Trust formally began on July 14, 2017, when the trustees opened an investment account for the $230,000 that was held by the Trepp Family Trust (Exhibit 21).  On Ausdal's New Account Form, which Defendant signed, Trepp indicated that he was willing to accept a "moderate" risk in the account investments, which meant he would "accept some risk to [his] initial principal and tolerate some volatility to seek higher returns, and [understood he] could lose a portion of the money invested" (Exhibit 21 at 3)  He rejected the risk categories of "moderately aggressive," "aggressive," and "speculation" (Exhibit 21 at 3).  The Ausdal form explained that there was a "high degree of risk" in speculative investments (Exhibit 21 at 3).  As Trepp's registered investment adviser, Defendant was required to adhere to the Trepp Family Trust's investment objectives and limitations (Tr. I at 16-17, 153).  At trial, Defendant could not recall whether or not he advised Trepp of the banks' fraud warnings (Tr. II at 78-79).  I credit the evidence of Defendant's deposition testimony that he was "'pretty sure'" he did not tell Trepp "'because it wouldn't have meant anything to him'" (Tr. II at 78).

As a trustee of the Trepp Family Trust, Defendant had the authority to transfer trust funds held by TD Ameritrade (Tr. I at 34).  The SEC's analysis of Trepp's account records indicated that approximately $32,000 of the Trepp Family Trust's funds were sent to Turkey directly (Tr. III at 89).  Other money was directed to Turkey through Defendant's accounts and through Trepp's daughter's bank accounts (Tr. III at 88, 108-15; Exhibit 11).  On January 24, 2018, $19,500 was withdrawn from the Trepp Family Trust's TD Ameritrade account (Tr. III at 101; Exhibit 11).  Those funds were deposited into Trepp's personal Bank of America account on

January 25, 2018 (Tr. III at 102; Exhibit 11).  On January 21, 2018, four days before the advisory

account assets were deposited into the Bank of America account, Trepp issued a Bank of

America check payable to Defendant in the amount of $19,000 (Tr. III at 102-03; Exhibit 11).

When Defendant tried to deposit that check into his Berkshire Bank account on January 24,

2018, the same day the funds were withdrawn from TD Ameritrade, the check was returned for

insufficient funds because the TD Ameritrade funds had not yet been deposited into Trepp's

Bank of America account (Tr. III at 103-04; Exhibit 11).  On January 29, 2018, after the $19,000

TD Ameritrade deposit cleared Trepp's Bank of America account, Trepp issued a cashier's check

to Defendant in the amount of $19,000 (Tr. III at 105-06; Exhibit 11).  Defendant deposited

$16,000 of Trepp's cashier's check into his Berkshire Bank account (Tr. III at 106; Exhibit 11).

There is no record of the disposition of the $3,000 difference between the amount of the cashier's

check and the amount Defendant deposited into his bank account (Tr. III at 106).  Based on

Defendant's testimony that he sometimes sent cash to Turkey via FedEx or UPS (Tr. II at 8), I

infer that Defendant sent at least some portion of that $3,000 in cash to Turkey.  Cash

transactions did not appear in the bank records (Tr. III at 107).

Some of Trepp's investments in the Turkish deal flowed through Trepp's daughter's Bank

of America account (Tr. III at 108-15; Exhibit 11).  Trepp's name was added to his daughter's

Bank of America account in April 2018 making it a joint account (Tr. III at 109).  On May 15,

2018, $12,500 was withdrawn from the Trepp Family Trust's TD Ameritrade account (Tr. III at

108; Exhibit 11).  That amount was deposited into the joint Bank of America account the next

day (Tr. III at 108; Exhibit 11).  On the same date, May 16, 2018, Trepp withdrew $10,000 from

the joint Bank of America account (Tr. III at 109-11; Exhibit 11).  Trepp then used the $10,000

to obtain two $5,000 cashier's checks that were payable to "Olufemi Sadiq," whose name

Barrister Morgan provided, and who, according to Defendant, was a link in the chain to facilitate payments to the parties in Turkey (Tr. II at 8-9; Tr. III at 110-11; Exhibit 11).  Defendant acknowledged that his investigation into third parties, such as Sadiq, was "pretty skimpy" (Tr. II at 9)  In August 2018, the funds for two cashier's checks totaling $14,000 were transferred from the Trust's TD Ameritrade account to "Olufemi Sadiq" via Trepp's and his daughter's joint Bank of America account (Tr. III at 111-14; Exhibit 11).

     E.     2019:  Trepp's Turkish Investments

A January 16, 2019, text message from Defendant to his friend Steven Luzi indicated that it would cost about $45,000 to rent a new cargo ship in Costa Rica and pay the ship's crew "to make a straight shot to Boston" (Tr. III at 92; Exhibits 36, 47).  Defendant stated that he "already talked to two other guys who have been in this for a while, and hopefully you [Luzi] who can share in a third of that for each – so that it doesn't all land on one person" (Tr. III at 92, 98-99; Exhibit 47).  The next day, January 17, 2019, $46,000 was withdrawn from the Trepp Family Trust's TD Ameritrade account (Tr. III at 93; Exhibit 47).  On January 18, 2019, the $46,000 from the TD Ameritrade account was deposited into Trepp's daughter's United Bank account (Tr. III at 93-94; Exhibit 47).  Trepp's name was not on that United Bank account on that date (Tr. III at 94).  However, that United Bank account became a joint account six days later, on January 24, 2019, when Trepp's name was added to the account (Tr. III at 94-95, 97; Exhibit 47).  On January 24, 2019, Defendant sent a text message to Luzi stating that "today" he sent $45,000 to the "bank in Australia which is the actual owner of the particular cargo ship . . . we are renting out of Costa Rica" (Tr. III at 96; Exhibit 47).  The United Bank records showed the failure of an attempted wire in the amount of $45,000 on that date, January 24, 2019 (Tr. III at 97, 98; Exhibit 47).  Five days later, Trepp's daughter withdrew $45,000 in cash from the United Bank account

that she held jointly with her father (Tr. III at 98; Exhibit 47).  Based on Defendant's text message to Luzi indicating that the ship cost $45,000, Defendant's January 24, 2019 message that "he" paid the purported Australian ship owner $45,000, United Bank's attempted wire of that amount of money on that same date, and Defendant's testimony that Trepp paid for the entire ship (Tr. I at 140; Tr. III at 92-99; Exhibit 47), I find that the $45,000 in cash that originated from Trepp's trust's TD Ameritrade account was used to pay for the purported cargo ship that was supposed to transport Marck's inheritance from Costa Rica to Boston.

The records of Trepp's trust and bank accounts showed that the total funds in the accounts decreased from approximately $350,000 in the third quarter of 2017 to approximately $120,000 in the first quarter of 2019 for a total reduction of approximately $230,000 (Tr. III at 85).  Trepp received nothing in return for the funds that were directed to the Turkish deal (Tr. II at 18; Tr. III at 115).

      F.    <u>Defendant's Disclosures Concerning the Turkish Investment</u>

At trial, Defendant acknowledged that the Turkish investment was "[n]ot just speculative, it was extremely high risk" (Tr. II at 62).  I do not credit Defendant's testimony that he "made sure" his friends who invested in the Turkish deal, including Trepp, understood the extent of the risk (Tr. II at 62).  That representation is inconsistent with Defendant's January 18, 2019 text message to Luzi in which Defendant requested $15,000 for the "Costa Rican cargo company" ship (Tr. II at 50-51; Exhibit 34).  Defendant indicated that Luzi would receive a "125%" rate of return on his investment and "the risk is 0" (Tr. II at 53; Exhibit 34).  In addition, contrary to Defendant's trial testimony, I credit Luzi's testimony that Defendant did not disclose to Trepp the potential risks that the Turkish investment posed during a meeting attended by Defendant, Trepp, and Luzi (Tr. II at 67; Tr. III at 10).  I also do not credit Defendant's testimony that Trepp's initial

investment in the Turkish deal was prompted by their mutual friend Luzi's investment because Defendant began directing Trepp's money to Turkey in January 2018, whereas Luzi did not contribute money to the Turkish deal until August 2018 (Tr. II at 61; Tr. III at 8, 81).

As to the rates of return that Defendant guaranteed Greeley and Trepp on their investments in the Turkish deal, Defendant testified that he did not make any representations (Tr. II at 44, 54). Rather, he was a mere conduit for Marck's promises that Greeley would receive 100 or 125 percent interest on his "loan" to her and she would pay Trepp $330,000 if she received her inheritance (Tr. II at 45-46, 55, 56-58). In light of Defendant's personal reasons for inducing Greeley and Trepp to continue meeting the Turkish parties' demands for money and his interest in escaping liability for violating the Advisers Act, I do not credit Defendant's denial that he quoted high rates of return to Greeley and Trepp on the so-called Turkish investment.

G.   Defendant's Disclosures Concerning his Compliance with Laws and Policies

Heather Johnson, an Ausdal Compliance Officer, visited Defendant on September 7, 2018 for an audit (Tr. I at 102-03). The questionnaire that Defendant completed prior to the audit focused on whether he had complied with the laws and Ausdal's policies governing his position as a registered investment adviser and included questions aimed at determining if he had engaged in any activities that created a conflict between his clients' interests and his personal interests (Tr. I at 102, 105-08, 110; Exhibit 4). Defendant indicated that he had never combined his personal funds with his clients' funds and had never loaned money to anyone outside his immediate family (Tr. I at 105-07; Exhibit 4 at 4, 5). Defendant did not disclose that he borrowed $18,000 from Judy Bordenuk, the daughter of his long-standing advisory clients, in early 2018, because the Turkish parties were demanding more money, he had depleted his personal funds, and Greeley's contributions to the Turkish investment were dwindling (Tr. I at

106, 165-66; Tr. II at 65-66; Tr. III at 81; Exhibit 4 at 5).  As to whether Defendant participated

in any outside business activities, Defendant stated that he sold outside insurance products (Tr. I

at 108-09; Exhibit 4 at 3).  He did not report the Turkish investment (Tr. I at 109; Exhibit 4).

After the SEC was notified that Defendant was transferring funds overseas, its examiners

conducted an audit of Defendant in March 2019 to determine whether or not he had breached his

fiduciary duty to his clients (Tr. I at 87-88).  Defendant reported that, since 2016, he had sent

$10,000 to his girlfriend or fiancée in Turkey for her son's surgery and for legal fees that would

enable her to obtain access to her inheritance, which he would manage (Tr. I at 92).  He further

indicated that only two of his advisory clients had been involved with the Turkish deal (Tr. I at

92-93).  Defendant told the SEC that Greeley sent money to Turkey and that Bordenuk loaned

Defendant money for the Turkish investment (Tr. I at 92-93).  Defendant told the SEC examiners

that he would re-pay both clients when he received Marck's assets (Tr. I at 92-93).  Defendant

did not mention Trepp's investments (Tr. I at 93).

Ausdal's Chief Compliance Officer, Nathan Westcomb, and Defendant's supervisor,

DeVita, discussed the Turkish arrangement with Defendant in early 2019 when they learned that

the SEC was going to audit him (Tr. I at 8, 33-34, 43).  Defendant indicated that Ausdal "may

not be happy" with his activities and disclosed to Ausdal for the first time that he and his clients

had sent money to Turkey (Tr. I at 43-44, 78).  I do not credit Defendant's claim that he disclosed

the Turkish investment to DeVita during a recorded conversation in 2017 (Dkt. No. 64 at 15; Tr.

I at 72, 78, 79).

Defendant provided more details to Westcomb and DeVita a few days after his initial

disclosure in early 2019 (Tr. I at 45).  Defendant described how he first became involved with

Marck and her inheritance and indicated that he wired money to Turkey from his personal bank

account (Tr. I at 46).  He expected to receive a percentage return on his investment after Marck's funds were transferred to the United States (Tr. I at 46).  Ausdal personnel determined that Defendant's Turkish investment constituted an outside business activity which Defendant was required to disclose to the firm (Tr. I at 47-48).  Because Defendant failed to disclose the Turkish deal, Ausdal terminated Defendant's association with the firm in April 2019 (Tr. I at 47, 85, 143-44).

IV.   CONCLUSIONS OF LAW

The SEC alleges that Defendant violated Section 206(1) and Section 206(2) of the Advisers Act.[2]  To establish a violation of Section 206(1), the SEC was required to prove by a preponderance of the evidence that the defendant:  (A) was an investment adviser; (B) utilized the mails or any means or instrumentality of interstate commerce; (C) "employ[ed] any device, scheme, or artifice to defraud any client or prospective client;" and (D) acted with scienter.  15 U.S.C. § 80b-6(1).  *See SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 200-01 (1963); *Steadman v. SEC,* 603 F.2d 1126, 1133-34 (5th Cir. 1979); *SEC v. Rashid*, 17-cv-8223 (PKC), 2020 WL 5658665, at *2 (S.D.N.Y. Sept. 23, 2020), *appeal docketed*, No. 20-4080 (2d Cir. Dec. 7, 2020).  To establish a Section 206(2) violation, in addition to proving that (A) the

---

[2] In pertinent part, Section 206 says:

It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly –

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; . . .

15 U.S.C. § 80b-6.

defendant was an investment adviser who (B) utilized the mails or any means or instrumentality of interstate commerce, the SEC was also required to prove that the defendant (C) "engage[d] in any transaction, practice, or course of business which operate[d] as a fraud or deceit upon any client or prospective client;" and (D) was negligent.  15 U.S.C. § 80b-6(2).  *See Rashid,* 2020 WL 5658665, at *2 ("A defendant may be liable under section 206(2) based on proof of negligence.").  "The SEC has the burden of proof on each claim and must prove each element of Section 206(1) and 206(2) by a preponderance of the evidence."  *SEC v. Bolla,* 401 F. Supp. 2d 43, 65 (D.D.C. 2005).

A.    <u>Defendant was an "Investment Adviser" under the Advisers Act.</u>

Section 202(a)(11) defines "[i]nvestment adviser" as "any person who, for compensation, engages in the business of advising others either directly or indirectly through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ."  15 U.S.C. § 80b–2(a)(11).  There is no dispute that Defendant was an "investment adviser" under the Advisers Act from at least 2016 to when he was discharged by Ausdal in April 2019.

B.    <u>Defendant used the Mails or an Instrumentality of Interstate Commerce</u>

The Act defines "interstate commerce" as "trade, commerce, transportation, or communication among the several States, or between any foreign country and any State, or between any State and any place or ship outside thereof."  15 U.S.C. § 80b-2(10).  By sending funds to Turkey via wire transfers and by sending cash to third-parties selected by Morgan via FedEx and UPS, Defendant used the mails or "interstate commerce" under the Act (Tr. II at 8; Tr. III at 75-80).  *See SEC v. Neman*, No. CV 12-03142-BRO (PLAx), 2015 WL 12745802, at *9

(C.D. Cal. Dec. 8, 2015) ("Defendants used interstate commerce, specifically by using wire communications and commercial carriers operating in interstate commerce, to effectuate fraud.").

    C.    <u>Defendant Breached his Fiduciary Duty to his Clients</u>

The Advisers Act aims to "prevent fraudulent practices by investment advisers." *Capital Gains Research Bureau, Inc.,* 375 U.S. at 195.  To accomplish that purpose, Section 206(1) and Section 206(2) "set '"federal fiduciary standards" to govern the conduct of investment advisers' and impose 'enforceable fiduciary obligations' on those advisers." *SEC v. Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (quoting *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979)).  "Section 206 of the Advisers Act establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." *SEC v. Moran,* 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996) (citing *TAMA,* 444 U.S. at 17).  *See SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008), *reh'g en banc granted, opinion withdrawn,* 573 F.3d 54 (1st Cir. 2009), *opinion reinstated in part on reh'g,* 597 F.3d 436 (1st Cir. 2010) ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of . . . investors . . . .").

    1.    Defendant breached his fiduciary duty by failing to disclose material facts, including his conflict of interest.

The Advisers Act's prohibitions on using a "device, scheme, or artifice to defraud clients," 15 U.S.C. § 80b-6(1), and from conducting a "transaction, practice, or course of business which operates as a fraud or deceit upon any client," 15 U.S.C. § 80b-6(2), also prohibit an investment adviser from making misstatements and omitting disclosures of material facts to investors. *See Tambone*, 550 F.3d at 146 (Section 206 imposes a fiduciary obligation that includes "an obligation to provide 'full and fair disclosure of all material facts' to investors . . . .")

(quoting *Capital Gains Research Bureau, Inc.,* 375 U.S. at 191, 194, 200-01); *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir. 1985) (material "false and misleading statements" were actionable under Section 206); *Penn,* 225 F. Supp. 3d at 237 ("Section 206's bar on schemes and artifices to defraud also prohibits non-disclosure of material information by an investment adviser.")  A misstated or nondisclosed fact is material "if there is a substantial likelihood that [it] would affect the behavior of a reasonable investor."  *SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008).

Defendant failed to disclose material information concerning his interest in the Turkish deal.  The Advisers Act "reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline a[n] investment adviser – consciously or unconsciously – to render advice which was not disinterested."  *Capital Gains Research Bureau, Inc.,* 375 U.S. at 191-92.  Defendant sent funds to Turkey in 2016 because he had a personal financial interest in increasing his income by managing Marck's $6 million inheritance and because he developed a romantic interest in Marck (Tr. I at 120-21, 126-27; Tr. II at 38).  Defendant did not approach Greeley or Trepp in 2016 (Tr. I at 165).  He turned to them in 2017 and 2018, respectively, when he had depleted his financial resources and could no longer meet the Turkish parties' continued demands for money to secure Marck's inheritance and presence in the United States (Tr. I at 165; Tr. II at 36; Tr. III at 52, 53).  Defendant's financial and personal stake in the Turkish deal was incompatible with his duty to give disinterested investment advice to Greeley and Trepp and constituted a conflict of interest.

To prove that Defendant breached his fiduciary duty by failing to reveal his self-interest in obtaining funds for the Turkish deal, "the SEC [was required to] establish that (1) the information in question was material, (2) Defendant[] had a duty to disclose the information, and (3) Defendant[] either omitted the information or misstated the information when making a

disclosure." *Bolla,* 401 F. Supp. 2d at 68.  The SEC sustained its burden.  First, it is well-settled

that potential conflicts of interest are material facts that investors would consider important in

making investment decisions.  *See Vernazza v. SEC,* 327 F.3d 851, 859 (9th Cir. 2003) (citing

*Capital Gains Research Bureau, Inc.,* 375 U.S. at 180, 201); *SEC v. Westport Capital Mkts. LLC,*

408 F. Supp. 3d 93, 104-05 (D. Conn. 2019).  Second, investment advisers have an affirmative

duty to disclose conflicts of interest to their clients.  "'[F]ailure by an investment adviser to

disclose potential conflicts of interest to [his] clients constitutes fraud within the meaning of

Sections 206(1) and (2).'"  *Robare Grp. LTD v. SEC,* 922 F.3d 468, 472 (D.C. Cir. 2019)

(quoting *Fundamental Portfolio Advisors, Inc.,* Investment Advisers Act Release No. 2146, 2003

WL 21658248, at *15 & n.54 (July 15, 2003)).  *See Belmont v. MB Inv. Partners, Inc.,* 708 F.3d

470, 503 (3d Cir. 2013) ("Under the 'best interest' test, an adviser may benefit from a transaction

recommended to a client if, and only if, that benefit and all related details of the transaction are

fully disclosed.") (citing *Capital Gains Research Bureau, Inc.,* 375 U.S. at 191-92); *SEC v. Wall*

*St. Pub. Inst., Inc.,* 591 F. Supp. 1070, 1084 (D.D.C. 1984), *rev'd on other grounds after remand*

*by* 851 F.2d 365 (D.C. Cir. 1988) ("failure to disclose an economic self-interest constitutes a

breach of the adviser's fiduciary duty in violation of section 206 of the Adviser's Act.") (citing

*Capital Gains Research Bureau*, 375 U.S. at 196).  Finally, the SEC proved that Defendant

neglected to disclose his interest before Greeley began sending money to Turkey in January 2017

and before Defendant started directing Trepp's trust funds to Turkish parties in January 2018.

From Greeley's testimony that he "didn't think" Defendant involved him in the Turkish

investment for reasons of personal interest, it is fair to infer that Defendant failed to disclose his

personal financial interest when he advised Greeley about the Turkish deal (Tr. II at 111).

Further, Defendant essentially admitted that he concealed his romantic interest in Marck until

Greeley, Trepp, and Luzi "confronted" him in 2018 or 2019 (Tr. II at 38-39).  Consequently, the SEC proved by a preponderance of the evidence that Defendant's nondisclosure of his personal interest in the Turkish deal constituted a breach of his fiduciary obligations under Section 206(1) and Section 206(2).  *See Tambone,* 550 F.3d at 146 (complaint that alleged that the defendant "failed to satisfy its fiduciary obligations by placing its own interests above those of the funds and their investors" sufficiently pled a violation of the Advisers Act); *Penn,* 225 F. Supp. 3d at 237 (defendant's "non-disclosure and outright misstatements breached his [fiduciary] duties . . . ."); *Bolla,* 401 F. Supp. 2d at 68 (investment adviser, who wanted to increase his client base and profits, breached his fiduciary duty by making material misstatements or omissions of material facts to the firm's clients and prospective clients who the adviser targeted as his prospective clients).

Defendant, who was Greeley's and Trepp's sole source of information about the Turkish investment, also concealed unambiguous scam warnings from two banks (Tr. I at 124-25; Tr. II at 71-73, 76; Tr. III at 15-16, 71-80).  A prospective investor would undoubtedly have considered that undisclosed information material.  *See Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) ("to fulfill the materiality requirement, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'") (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).  As Greeley's and Trepp's investment adviser, Section 206 obligated Defendant to "'full[y] and fair[ly] disclose . . . all material facts'" and "'employ reasonable care to avoid misleading his clients.'"  *Capital Gains Research Bureau, Inc.,* 375 U.S. at 194 (citations and footnotes omitted).  The credible testimony indicates that

Defendant did not disclose the banks' warnings to Greeley and Trepp and, consequently, the SEC proved that Defendant breached his duty to disclose that material information.

2.  Defendant breached his fiduciary duty of care.

There were multiple red flags that should have alerted Defendant to the likelihood that the Turkish investment was a scam.  He nonetheless solicited Greeley's and Trepp's significant investments in the deal.  Defendant's failure to investigate the legitimacy of the Turkish investment was a breach of his fiduciary duty to exercise due care.  *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 858 (9th Cir. 2001) (defendant, a "securities professional," "had a duty to make an investigation that would provide him with a reasonable basis for a belief that the key representations in the statements provided to the investors were truthful and complete."); *Hanly v. SEC*, 415 F.2d 589, 596 (2d Cir. 1969) (under the Securities Exchange Act, a broker "cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant.");[3] *see also* Commission Interpretation Regarding Standard Of Conduct For Investment Advisers, Investment Advisers Act Release No. 5248, 2019 WL 3779889, at *6 (June 5, 2019) (hereinafter "Standard of Conduct Release").

Instead of conducting due diligence to determine whether there was a reasonable basis for Greeley and Trepp to provide funds to the Turkish deal, Defendant relied on "soul searching" and his "instincts" when recommending the Turkish investment to his clients (Tr. I at 168, 169). Defendant did not ask for the names of the two men who first approached him in Newport (Tr. II at 7).  He never spoke to or met his main contacts in Turkey (Tr. I at 174, 176, 177, 179).  He

---

[3] Although the defendants in *Dain Rauscher, Inc.* and *Hanley* were charged with violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), the provisions of that statute and the Advisers Act are "'substantially similar.'"  *Penn,* 225 F. Supp. 3d at 237 (quoting *TAMA, Inc.,* 444 U.S. at 25 n.1 (White, J., dissenting)).

took no steps to ensure that "Marck" with whom he was communicating by email, was who she represented herself to be (Tr. I at 175). An internet search would have revealed that the supposed power of attorney from the Turkish "High Court of Justice" was issued by a court that does not exist (Tr. II at 25). Defendant failed to conduct internet searches on Morgan and Longman notwithstanding the irregularities that appeared in their e-mail communications (Tr. II at 14-15, 18-19). If he had inquired, Defendant would have found that the names Morgan used were associated with a scam, that Longman was not using the e-mail suffix of AKBank's employees, and that AKBank did not have branches at the addresses that appeared on Longman's e-mail messages (Tr. II at 14, 15, 20, 24). As proof of Marck's inheritance, Defendant relied on a purported AKBank account statement that was signed by "Woodrow Wilson," the twenty-eighth president of the United States (Exhibit 53 at 2). In addition, Defendant ignored Berkshire Bank's and Bank of America's warnings of a scam (Tr. II at 71, 72-73; Tr. III at 15-16). If those irregularities were not sufficient to alert Defendant that the Turkish deal was a scam, the repeated and escalating requests for financing to transport the $6 million in cash, coupled with the fanciful explanations for repeated delays, should have set off alarms (Tr. I at 127-42). Defendant violated his fiduciary duties to his clients by failing to conduct due diligence before Greeley contributed approximately $125,000 and Trepp provided at least $45,000 for the purported voyage (Tr. I at 131, 140). *See Basking Planning Consultants, Ltd.,* Investment Advisers Act Release No. 1297, 1991 WL 288638, at *1 (Dec. 19, 1991) (adviser violated the Advisers Act by recommending that clients invest in a Ponzi scheme without first conducting adequate due diligence); *Alfred C. Rizzo,* Investment Adviser's Act Release No. 897, 1984 WL 470013, at *3 (Jan. 11, 1984) (investment adviser violated the Advisers Act by failing to investigate "incredible claims" made by the issuer of securities).

Defendant took unfair advantage of Trepp's circumstances and breached his fiduciary duty of care. An investment adviser's duty of care includes the duty to provide investment advice that is in the client's best interest. *See* Standard of Conduct Release, 2019 WL 3779889, at *4. In order to provide appropriate advice, an investment adviser "must have a reasonable understanding of the client's objectives." *Id.* To gain an understanding of the client's objectives, at a minimum, the investment adviser should "make a reasonable inquiry into the client's financial situation, level of financial sophistication, investment experience, and financial goals," which are referred to as the client's "investment profile." *Id.* at *5. When determining the suitability of an investment for a client, the adviser should consider whether the recommended investment falls within the client's risk tolerance. *Id.* at *4, *5.

Defendant understood Trepp's investment profile but ignored it when directing Trepp's funds to Turkey. The Trepp Family Trust was established to preserve assets for Trepp's modest living expenses and for Trepp's daughter and minor grandson (Exhibit 24). As a trustee, Defendant had access to the trust's assets (Tr. I at 34). Although Defendant acknowledged that Trepp was of diminished capacity and that the investment in Turkey was "extremely high risk" (Tr. II at 62; Exhibit 4 at 3), Defendant took advantage of Trepp's compromised status, violated his fiduciary obligations as a trustee of the Trepp Family Trust, and disregarded the trust's moderate risk tolerance. These actions harmed Trepp (and other members of his family) and violated the Advisers Act. *See Maria T. Giesige,* SEC Release No. 359, 2008 WL 4489677, at *26 (Oct. 7, 2008) ("The evidence is overwhelming that Giesige breached the fiduciary duty she owed to her investment adviser clients, almost all of whom were people of moderate means who are fairly conservative in their level of risk tolerance," by investing their funds in what she acknowledged was a "substantially risky investment" and by misrepresenting the degree of risk);

*Phillip A. Lehman,* Investment Advisers Act Release No. 1831, 1999 SEC LEXIS 1927, at *7-8 (Sept. 22, 1999) (the adviser's investment recommendation was unsuitable "in light of the conservative nature of the investor's IRA account" and the investor's age); *George E. Brooks & Assoc., Inc.,* Investment Adviser's Act Release No. 40329, 1998 WL 479756, at *4-5, 6 (Aug. 17, 1998) (adviser, who had "complete discretion" over the accounts of elderly clients with little investment experience and conservative investment objectives, violated Sections 206(1) and (2) by investing in "speculative high-risk stocks" without "informing [the clients] of the risks involved in the transactions.").

        3.     Defendant's Arguments

Defendant contends that the SEC has failed to prove he breached his fiduciary duty in his role as investment adviser. He asserts that he disclosed the risks of the Turkish investment to Greely and Trepp (and Luzi), that Greeley, Trepp, Luzi, and he were close friends of very longstanding, that, as friends, Greeley and Trepp were free to choose to participate in the Turkish deal, and that they did so with their eyes open to the risk (and potential reward). Finally, he argues that he did not charge management fees and did not make money from his friends' investments in the Turkish deal.

Plaintiff's contentions ignore the following facts. First, from the outset, he had a strong financial interest in the Turkish deal because of the money he expected to earn by managing Marck's supposed inheritance (Tr. I at 46, 126-27, 145, 155). Second, Defendant cannot divorce himself from his role as investment adviser just because he had known Greeley and Trepp for many years. Greely trusted Defendant to make recommendations that were in Greeley's best interests (Tr. II at 120). Defendant gave Greeley information about the Turkish deal that was "enough to convince [him] that it was a reasonable situation" (Tr. II at 112). Greeley used

money from his investment advisory account to fund some of his contributions to the Turkish deal (Tr. III at 62-67; Exhibits 17, 19).  On these facts, Defendant's claim that he was not functioning as an investment adviser to Greely is untenable.

Defendant's conduct vis-à-vis Trepp is particularly reprehensible.  The evidence was that Defendant viewed Trepp as disabled and limited in his ability to understand financial matters (Tr. II at 59, 78; Exhibit 4 at 3).  Defendant knew that Trepp needed the money in the Trepp Family Trust to cover his modest living expenses (Exhibit 24).  Defendant's role as trustee of the Trepp Family Trust enabled him to move money out of the trust's investment account (Tr. I at 34).  He abused that position.  Defendant did not disclose the banks' fraud warnings to Greeley or Trepp, nor did he do the necessary due diligence before he caused his good friends, who were also his investment advisory clients, to invest hundreds of thousands of dollars in a deal that had all of the hallmarks of an obvious scam.

In sum, Defendant's contentions do not stand up to scrutiny or counter the SEC's convincing evidence that Defendant breached his fiduciary duty to Greeley and Trepp.

D.      Defendant Acted with the Required State of Mind to Find Violations of Section 206(1) and Section 206(2).

As previously noted, Sections 206 (1) and (2) of the Advisers Act differ only as to the state of mind required for finding liability.  A violation of Section 206(1) requires a determination that the adviser acted with scienter, while proof of "simple negligence" satisfies Section 206(2).  *Robare Grp., Ltd.,* 922 F.3d at 472.  *See Rashid,* 2020 WL 5658665, at *2.  The evidence adduced at trial proved by a preponderance of the evidence that Defendant acted with scienter and that he was negligent.

1.      Defendant acted with scienter.

"Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *ZPR Inv. Mgmt. Inc. v. SEC*, 861 F.3d 1239, 1252 (11th Cir. 2017) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quotation omitted)).   "'[F]acts giving rise to a "strong inference" of fraudulent intent'" are sufficient to prove scienter.  *SEC. v. Gruss*, 859 F. Supp. 2d 653, 669 (S.D.N.Y. 2012) (quoting *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir. 1991)).  "The requisite 'strong inference' may be established '(a) by . . . facts to show that defendant[] had both motive and opportunity to commit fraud, or (b) by . . . facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir. 2001)).  *See SEC v. EagleEye Asset Mgmt. LLC*, 975 F. Supp. 2d 151, 158 (D. Mass. 2013) ("To prove scienter, a plaintiff must show 'either a conscious intent to defraud or a high degree of recklessness.'") (quoting *Ficken,* 546 F.3d at 47 (internal quotation marks omitted)).

> The kind of recklessness required, however, is not merely a heightened form of ordinary negligence; it is an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading [clients] that is either known to the defendant or is so obvious that the actor must have been aware of it."

*SEC v. Steadman*, 967 F.2d 636, 641–42 (D.C. Cir. 1992) (quoting *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977)).  *See Ficken,* 546 F.3d at 47-48 (same). "In other words, it is 'a lesser form of intent.'"  *Steadman,* 967 F.2d at 642 (quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir. 1977)).  *See Wall St. Pub. Inst., Inc.*, 591 F. Supp. 1084 ("As the courts have noted, the terms 'knowing' and 'intentional' are not synonymous: 'Use of the word "knowing" implies conduct which is somewhat less directed and focused than "intentional" activity which commonly is characterized by a specific mental state whose animus is to bring about a particular result.'") (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 45 (2d Cir. 1978)).

First, although the SEC is not required to prove motive, if there is evidence of motive, it can establish actual intent.  *See SEC v. Life Wealth Mgmt., Inc.,* CV 10-4769 RSWL (MANx), 2012 WL 12919299, at *6 (C.D. Cal. Nov. 9, 2012).  "Motive to commit fraud entails '"concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."'"  *In re Rsrv. Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 319–20 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir. 2000)).

There is evidence of motive and actual intent here.  When Defendant's money ran out, he turned to Greeley and Trepp to continue meeting the demands for the money that was purportedly needed to bring Marck and her inheritance to the United States (Tr. II at 15, 36-37, 108; Tr. III at 52, 53; Exhibits 11, 51).  Defendant expected to profit personally from the opportunity to manage Marck's inheritance (Tr. I at 126-27, 145).  He also had a romantic interest in her (Tr. I at 120-21; Tr. II at 38).  The prospect of "personal financial gain . . . weigh[s] heavily in favor of a scienter inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007).  *See SEC v. RRBB Asset Mgmt., LLC*, Civ. No. 20-12523 (KM) (ESK), 2021 WL 3047081, at *5 (D.N.J. July 20, 2021) ("management fees can be a sufficient motive [to satisfy the scienter element of Section 206(1)] if the defendant has a 'unique incentive' to obtain them or 'a personal financial stake.'") (quoting *In re Reserve Fund Sec. & Derivative Litig.,* 732 F. Supp. 2d at 321).  In Defendant's communications with Greeley, he exaggerated the amount of money he had personally spent on the Turkish deal by approximately $150,000 in order to induce Greeley's investment (Tr. II at 42; Tr. III at 40).  That misrepresentation is additional evidence of Defendant's conscious intent to defraud.

Next, the Turkish deal had such obvious hallmarks of a scam that Defendant, with four decades of experience as an investment adviser, was reckless in failing to question it and in

inducing Greeley and Trepp to invest.  Recklessness can be inferred from evidence that the defendant "'failed to review or check information that [he] had a duty to monitor, or ignored obvious signs of fraud.'"  *SEC v. Lowy*, 396 F. Supp. 2d 225, 243 (E.D.N.Y. 2003) (quoting *Novak,* 216 F.3d at 308).  *See SEC v. Milan Grp., Inc.*, 962 F. Supp. 2d 182, 196 (D.D.C. 2013), *aff'd in part, vacated in part, remanded,* 595 F. App'x 2 (D.C. Cir. 2015) ("'An egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an inference of . . . recklessness.'") (alterations in original) (quoting *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 269 (3d Cir. 1996)).  The evidence on this point includes Defendant's failure to accept, investigate, or pass along the banks' scam warnings, and his failure to conduct any due diligence into an obviously suspicious deal.  He was reckless by failing to conduct "any meaningful independent investigation to confirm the truth of [his] representations" that persuaded Greeley and Trepp to invest.  *Gebhart v. SEC,* 595 F.3d 1034, 1044 (9th Cir. 2010).

In addition, Defendant's "extreme recklessness" can be inferred from his knowledge of Trepp's personal situation and limited risk tolerance.  By any measure, it was reckless to use Trepp Family Trust funds for the Turkish deal.  *See SEC v. Persaud*, No. 6:12-cv-932-Orl-28GJK, 2013 WL 6478800, at *6 (M.D. Fla. Dec. 10, 2013) ("These actions constitute an 'extreme departure from the standards of ordinary care,' and the danger of misleading [clients] from these actions was 'so obvious' that [the defendant] must have known about it. [The defendant] acted with scienter.") (citation omitted); *Maria T. Giesige,* 2008 WL 4489677, at *25 ("Acting with scienter or with utter recklessness, Giesige advised clients to invest their funds, including their retirement funds, in what she represented to them was a good investment with no undue risk.  However, Giesige lied to her clients, because, as she testified, she considered Carolina Development to be a substantially risky investment.").

30

Finally, Defendant's attempts to conceal his clients' investments in the Turkish deal "support a strong inference of scienter." *In re Galena Biopharma, Inc. Sec. Litig.,* 117 F. Supp. 3d 1145, 1166 (D. Or. 2015).  Defendant tried to hide his wrongdoing by disguising his use of Trepp Family Trust funds when he funneled them to the Turkish deal through private bank accounts, by failing to disclose his involvement in the Turkish deal to Heather Johnson of Ausdal, by misrepresenting to the SEC the amount he had sent to Turkey, and by failing to disclose to the SEC that Trepp invested in the Turkish deal (Tr. I at 92, 93, 109; Tr. III at 108-15).  *See Nathanson v. Polycom, Inc.,* 87 F. Supp. 3d 966, 979–80 (N.D. Cal. 2015) (defendant's attempts to hide his fraudulent conduct was evidence of scienter); *SEC v. Falor,* No. 1:09-CV-5644, 2010 WL 3385510, at *3 (N.D. Ill. Aug. 19, 2010) (the defendant's "guilty knowledge is confirmed by his alleged attempt to 'cover-up' the fraud . . . ."); *In re Nature's Sunshine Prods. Sec. Litig.,* 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter.").  *Cf. Malouf v. SEC,* 933 F.3d 1248, 1263 (10th Cir. 2019) (upholding SEC's finding of scienter under Section 206(1) based on the defendant's failure to disclose a conflict of interest).

        2.        Defendant acted with negligence.

To the extent Defendant lacked guilty knowledge, his actions were negligent as required for finding a violation of Section 206(2).

> Negligence is the failure to exercise ordinary care. *Bolla,* 401 F. Supp. 2d at 72. Phrased differently, negligence is the failure to use the "degree of care that a reasonably careful person would use under like circumstances." *In re Reserve Fund Sec. & Derivative Litig.,* [Nos. 09 MD.2011(PGG), 09 Civ. 4346(PGG),] 2013 WL 5432334, at *12 n.7 [(S.D.N.Y. Sept. 30, 2013)].  That means a person may be negligent by doing what no reasonable person would do, or by not doing what every reasonable person would do.  *Id.*

*SEC v. Nutmeg Grp., LLC,* 162 F. Supp. 3d 754, 775 (N.D. Ill. 2016).  Under that standard, "a violation of the Advisers Act may be established by showing that a defendant 'should have' acted differently."  *Id.* (quoting *Steadman,* 967 F.2d at 643); *see also Moran,* 922 F. Supp. at 897–98.

The SEC sustained its burden to prove that Defendant was negligent by failing to "employ reasonable care to avoid misleading his clients."  *Capital Gains Research Bureau,* 375 U.S. at 194.  He failed to heed or investigate the banks' warnings of a scam, conduct any investigation into Marck, Morgan, Longman, and other individuals to whom money was sent notwithstanding the irregularities in the e-mail communications and the failure of the Turkish parties to provide any return on his investment, inform Greeley and Trepp of his conflict of interest, or to refrain from using Trepp's funds when he knew that the Turkish investment was speculative and contrary to Trepp's investment profile.  In addition, Defendant violated Ausdal's policies and procedures and Code of Ethics by concealing his involvement in the Turkish deal and the concomitant conflict of interest from his supervisors at Ausdal.  Defendant's failure to act with the degree of care required of a reasonable financial adviser constitutes negligence under Section 206(2).  *See Bolla,* 401 F. Supp. 2d at 72.

V.    CONCLUSION

The SEC has proved by a preponderance of the evidence that Defendant violated Sections 206(1) and (2) of the Advisers Act.  The parties are directed to appear for a status conference on September 29, 2021 at 11:00 a.m.  If that date and time are not convenient for the parties, they are to confer and notify the Clerk's office of an alternative, mutually agreed-upon date and time.

It is so ordered.

Dated:  September 15, 2021                                   /s/ Katherine A. Robertson
                                                            KATHERINE A. ROBERTSON
                                                            U.S. MAGISTRATE JUDGE