UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-11735-KAR |
| | ) | |
| RICHARD DUNCAN, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING THE SECURITIES & EXCHANGE
COMMISSION'S MOTION FOR REMEDIES
(Dkt. No. 71)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

The Securities and Exchange Commission ("SEC") brought a civil enforcement action

against Defendant Richard Duncan ("Defendant") for violations of the Investment Advisers Act

of 1940 ("Advisers Act").  Following a bench trial, the court found that Defendant violated §§

206(1) and 206(2) ("Section 206(1)" and "Section 206(2)") of the Advisers Act (Dkt. No. 66).

*See S.E.C. v. Duncan,* Case No. 3:19-cv-11735-KAR, 2021 WL 4197386, at *15 (D. Mass. Sept.

15, 2021). The SEC has moved for remedies (Dkt. No. 71).  Defendant has not responded.  The

SEC's motion is ALLOWED.  For the reasons that follow, the court enjoins Defendant from

future violations of the Advisers Act, orders disgorgement to Stephen Trepp in the amount of

$104,080 plus prejudgment interest of $14,716, and orders Defendant to pay a civil penalty in the

amount of $414,366.

II.    INJUNCTIVE RELIEF

The SEC has requested that this court issue a permanent injunction enjoining Defendant from engaging in further violations of the Advisers Act (Dkt. No. 72 at 3). *See* 15 U.S.C. § 80b-9(d). The Advisers Act provides that a court "shall" grant a permanent injunction "[u]pon a showing that such person has engaged, is engaged, or is about to engage" in violating the Advisers Act. 15 U.S.C. § 80b-9(d). Trial courts have considerable discretion in granting injunctive relief. *See S.E.C. v. John Adams Tr. Corp.*, 697 F. Supp. 573, 577 (D. Mass. 1988) ("The federal courts are vested with wide discretion when an injunction is sought to prevent future violations of the statutory securities laws.").

"The legal standard applied to determine whether injunctive relief is warranted is whether there is a reasonable likelihood that the defendant will engage in future violations of the law." *S.E.C. v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 185 (D.R.I. 2004). *See S.E.C. v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) (injunctive relief is appropriate where there is a "reasonable likelihood of recidivism"). "In determining whether future violations are reasonably likely, courts consider, among other factors, [1] the nature of the violation (including its 'egregiousness and its isolated or repeated nature'), [2] whether the defendant will be in a position to violate the law again, and [3] whether the defendant has recognized the wrongfulness of his conduct." *S.E.C. v. Present*, Case No. 14-cv-14692-LTS, 2018 WL 1701972, at *1 (D. Mass. Mar. 20, 2018) (quoting *Sargent*, 329 F.3d at 39).

After weighing those factors, the court determines that a permanent injunction against Defendant is necessary. Defendant's violations of Advisers Act were egregious and might well recur if injunctive relief does not enter.

Defendant's misconduct is described in the court's September 15, 2021, Findings of Fact, Conclusions of Law, and Order (Dkt. No. 66). The fraud that Defendant perpetrated upon two

advisory clients, Robert Greeley and Stephen Trepp, spanned more than two years. Defendant's attempts to conceal his conduct from the broker-dealer with which he was associated and the SEC evinced his intent to continue to use his clients' funds to further his personal interest if he had not been caught (Dkt. No. 66 at 15-16).

From August to December 2016, Defendant sent at least $32,000 of his personal funds to parties in Turkey who were conducting a scam (Dkt. No. 66 at 6). He did not receive anything in return (Dkt. No. 66 at 6). When Defendant's personal and investment account funds were almost depleted, he began soliciting investment advisory clients to invest in the Turkish scam (Dkt. No. 66 at 3). In January 2017, without conducting due diligence into the legitimacy of the Turkish arrangement, Defendant turned to his long-time friend and client, Greeley, to provide $15,800 towards the scam (Dkt. No. 66 at 6). Greeley sent the money after Defendant grossly misrepresented how much he had invested in the Turkish arrangement to induce Greeley to invest (Dkt. No. 66 at 7). Over a year, Greeley transferred approximately $250,000 to parties in Turkey either directly, or through Defendant, or via MoneyGram. Greeley received nothing in return (Dkt. No. 66 at 9).

When Greeley's interest in the Turkish deal waned toward the end of 2017, Defendant turned to the funds of another long-time friend, Stephen Trepp. Defendant's dissipation of Trepp's assets was particularly egregious (Trial Exhibit 8c). Without advising Trepp that the Turkish deal was an "extremely high risk" investment that was inconsistent with Trepp's acceptance of investments with a "moderate" risk, Defendant took advantage of his position as a trustee of the Trepp Family Trust's trust assets and Trepp's diminished capacity to further his personal interest in the Turkish scam (Dkt. No. 66 at 10-11, 14).

Defendant omitted and misrepresented material facts to obtain Greeley's and Trepp's investments in the Turkish scam.  Defendant failed to disclose the conflict between his clients' interests and his personal interests (Dkt. No. 66 at 21-22, 26).  Defendant also failed to reveal the banks' repeated and unambiguous scam warnings concerning the Turkish arrangement (Dkt. No. 66 at 7-8, 11, 22-23).  Defendant falsely represented the high rates of return that his clients could expect from their investments in the Turkish deal (Dkt. No. 66 at 14-15).  In addition, Defendant breached his fiduciary duty by failing to investigate the questionable Turkish contacts who requested funds (Dkt. No. 66 at 3-5, 27).  If Defendant had conducted minimal internet searches or used common sense, he could have recognized that the Turkish deal was an advance-fee scam (Dkt. No. 66 at 3-5).

The first factor supports the SEC's request for a permanent injunction.

As to the second factor, the record is replete with evidence that Defendant refused to accept responsibility for his wrongdoing.  Defendant claimed that he did not violate the Advisers Act because he only involved his long-time friends, Greeley and Trepp (and Luzi, who was not Defendant's investment advisory client) (Trial Transcript vol. II [Tr. II] at 91).  The court rejected Defendant's contention that Greeley and Trepp invested in the Turkish deal with full awareness of its risks and his personal interests (Dkt. No. 66 at 7-8, 11, 14, 21-22, 27).  Defendant's argument that he did not violate the Advisers Act because he did not personally profit from his clients' investments ignored his personal interest in continuing investments in the Turkish scam for personal reasons (Dkt. No. 66 at 26).  The second factor also weighs in the SEC's favor.

Finally, Defendant is likely to violate the Advisers Act again.  He indicated that he desired and intended to continue working (Dkt. No. 66 at 2; Tr. I at 119; Tr. II at 101-102). Defendant did not accept that he had responded to a scam (Tr. I at 115-117).

Because Defendant expressed his intent to continue working as an investment adviser and has not accepted responsibility for his violations of the Advisers Act, the court will allow the SEC's motion to enjoin Defendant from future violations of the Act.

III.    DISGORGEMENT AND PREJUDGMENT INTEREST

The SEC also seeks an order requiring Defendant to pay disgorgement of $104,080, the amount taken from Trepp's account, plus prejudgment interest of $14,716 (Dkt. No. 72 at 3-6). Disgorgement 'is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs' by 'wrest[ing] ill-gotten gains from the hands of [the] wrongdoer.'" *S.E.C. v. Faulkner*, Civil Action No. 3:16-CV-1735-D, 2021 WL 75551, at *3 (N.D. Tex. Jan. 8, 2021), *appeal docketed sub nom. S.E.C. v. Hallam,* No. 21-10222 (5th Cir. Mar. 9, 2021) (alterations in original) (quoting *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 415 (5th Cir. 2007)). The Supreme Court recently reaffirmed the power of the SEC to seek "a disgorgement award that does not exceed the wrongdoer's net profits and is awarded for victims . . . ." *Liu v. S.E.C.,* 140 S. Ct. 1936, 1940 (2020).

"The [c]ourt has discretion to enter an order of disgorgement in an amount reflecting 'a reasonable approximation of the profits causally connected to [Defendant's] violations.'" *Present,* 2018 WL 1701972, at *2 (quoting *S.E.C. v. Happ,* 392 F.3d 12, 31 (1st Cir. 2004)). Although a causal connection is required, disgorgement is not limited to the actual property obtained by means of wrongdoing.  *See S.E.C. v. Banner Fund Int'l,* 211 F.3d 602, 617 (D.C. Cir. 2000) ("the requirement of a causal relationship between a wrongful act and the property to be

disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act.  Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge.").  "If the Commission shows a causal relationship between the defendant's wrongdoing and the amount by which he was unjustly enriched, that amount of money may be disgorged even if the defendant has otherwise disposed of, reinvested, or spent the particular assets that he wrongfully obtained." *S.E.C. v. Seghers*, 298 F. App'x 319, 336 (5th Cir. 2008).

The SEC has demonstrated the requisite causal connection between Defendant's violation of the Advisers Act and the amount of the Trepp Family Trust assets that were transferred to the parties running in the scam.  As a co-trustee of the Trepp Family Trust with the power to withdraw the trust's assets from the trust's advisory account (Dkt. No. 66 at 11), Defendant "effectively used the [trust] as his own personal piggy bank . . . " to continue funding the Turkish scam, notwithstanding his knowledge of Trepp's vulnerabilities and financial needs. *S.E.C. v. Renfret,* 19-cv-6037 (AJN), 2020 WL 6559411, at *2 (S.D.N.Y. Nov. 9, 2020).  The SEC traced $104,080 of Trepp's assets to parties who were involved in the Turkish scam (Trial Exhibit 8c). *See Renfret,* 2020 WL 6559411, at *5-6 (granting SEC's request for disgorgement of the amount defendant "misappropriated from investors"); *S.E.C. v. Muraca,* Civil Action No. 17-cv-11400, 2019 WL 6619297, at *8 (D. Mass. Dec. 5, 2019) (granting SEC's request for disgorgement where the defendant "misappropriated" investors' funds for his personal use).  The funds, which came primarily from the Trepp Family Trust's advisory account, were disbursed either directly from the trust accounts to Turkish parties or funneled through Defendant's accounts (Dkt. No. 72-1 at 2 ¶¶ 5, 6).  Because Defendant used $104,080 of the assets being held in trust for a vulnerable individual for his personal purposes and gain, it is consistent with equitable principles

to order him to pay disgorgement in that amount.  *See Muraca,* 2019 WL 6619297, at \*8 (citing *S.E.C.* v. *First Jersey Sec., Inc.,* 101 F.3d 1450, 1474, (2d Cir. 1996)).

As to the SEC's request for prejudgment interest on the disgorged amount, "'[a]n award of pre-judgment interest in a case involving violations of the federal securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness.'" *Id.* at \*9 (quoting *S.E.C. v. Tome*, 638 F. Supp. 638, 639 (S.D.N.Y. 1986)).  "Although the First Circuit has stated that it has 'found no case holding that an award of disgorgement must always be accompanied by an award of prejudgment interest,' it has recognized that 'many courts that order disgorgement routinely also order payment of prejudgment interest.'"  *Id.* (quoting *Sargent*, 329 F.3d at 41, n.1 (internal quotations omitted)).  "[A]n assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws."  *Sargent,* 329 F.3d at 40 (internal quotations omitted).  "If a court does not order prejudgment interest, a defendant who has violated securities law receives an 'interest-free loan' on the profits he has made through his fraud."  *Muraca,* 2019 WL 6619297, at \*8 (quoting *Sargent,* 329 F.3d at 41).  "Prejudgment interest rates are commonly calculated using the rate applied by the Internal Revenue Service ["IRS"] to calculate underpayment penalties." *Id.* (citing *S.E.C. v. Spencer Pharm. Inc.*, Civil Action No. 12-cv-12334-IT, 2015 WL 5749436 at \*7 (D. Mass. 2015) (citing I.R.C. § 6621(a)(2)); *see also S.E.C. v. Druffner*, 517 F. Supp. 2d 502, 512 (D. Mass. 2007).

Here, Defendant's misappropriation of Trepp's assets warrants the imposition of prejudgment interest on the disgorgement amount.  Using the interest rate the IRS uses to calculate underpayment penalties, compounded quarterly, the SEC has calculated interest of

$14,716 on the disgorgement amount of $104,080 (Dkt. No. 72-1 at 3 ¶ 8, at 5-12).  Accordingly, Defendant will be ordered to pay a total of $118,796 in disgorgement and prejudgment interest.

IV.    CIVIL PENALTY

The SEC is also seeking a civil penalty (Dkt. No. 72 at 6-8).  "Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *Rinfret,* 2020 WL 6559411, at *7.  The Advisers Act provides that when "any person has violated any provision" of the Act, the court "shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 80b-9(e)(1).  The penalties are set forth in a series of three tiers.  *See* 15 U.S.C. § 80b-9(e)(2). The SEC seeks a third-tier penalty, which is imposed if:

 (I) the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (II) such violation directly or indirectly results in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. § 80b-9(e)(2)(C).

The third tier penalty is both the harshest of the three [tiers] and requires the greatest showing, as the first tier penalty is to be determined by the court "in light of the facts and circumstances," but does not require a showing of fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement or a showing of substantial losses or a risk of substantial losses, while the second tier penalty only requires the former showing, but not the latter.

*S.E.C. v. Dang*, No. 3:20-cv-01353 (JAM), 2021 WL 1550593, at *7 (D. Conn. Apr. 19, 2021).

The amount of the penalty that is imposed under the third tier "shall not exceed the greater of (i) $100,000 for a natural person [as adjusted for inflation] . . . or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation . . . ."  15 U.S.C. § 80b-(9)(e)(2)(C).  For violations that occurred after November 2, 2015, the statutory per violation maximum third-tier penalty amount, as adjusted for inflation, is $207,183 for all penalties

imposed after January 15, 2021.  *See* 17 C.F.R. § 201.1001(b) (citing

https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm).

"While the Act provides for penalties 'for each such violation,' the Act does not define the term 'violation.'"  *Dang,* 2021 WL 1550593, at \*6.  "Case law indicates, however, that district courts have the discretion to calculate penalties based on each violative act.  Courts may look to either the number of violative transactions or the number of investors to whom illegal conduct was directed."  *S.E.C. v. Illarramendi*, 260 F. Supp. 3d 166, 183 (D. Conn. 2017) (quotations and citations omitted).  The factors courts look to in determining whether a penalty should be imposed and the amount of the penalty for securities violations include "[1] the egregiousness of the violation, [2] the defendant's willingness or failure to admit wrongdoing, [3] the isolated or repeated nature of the violations, [4] the degree of scienter involved, and [5] the defendant's current financial condition."  *Present*, 2018 WL 1701972, at \*4 (citing *S.E.C. v. Esposito*, 260 F. Supp. 3d 79, 93 (D. Mass. 2017)).  "The burden rests with [Defendant] to demonstrate his inability to pay."  *U.S.S.E.C. v. Integrity Fin. AZ, LLC*, No. 1:10 CV 782, 2012 WL 176228, at \*10 (N.D. Ohio Jan. 20, 2012).

The court has considered most of these factors in discussing the SEC's request for a permanent injunction and disgorgement.  The Defendant's conduct was egregious, particularly with respect to Trepp, and he has not accepted responsibility for his wrongdoing.  He acted intentionally and sought to benefit himself at Greeley and Trepp's expense.  He concealed information, overstated his investment in the Turkish scam to induce Greeley to invest, failed to conduct basic due diligence on a scheme that had all the hallmarks of a scam, and attempted to hide his wrongdoing (Dkt. No. 66 at 28-31).  Because Defendant has not submitted a response to the SEC's motion, the court cannot determine whether the penalty should be reduced due to his

9

present financial condition.  The factors, therefore, weigh in favor of imposing a third-tier civil penalty.

As to the calculation of the penalty, the SEC asks the court to impose the maximum statutory amount for each of the two victims, Greeley and Trepp (Dkt. No. 72 at 7-8).  The current statutory maximum amount, as adjusted for inflation, is $207,183.  *See* 17 C.F.R. § 201.1001(b) (citing https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm).  The number of victims is an appropriate measure of Defendant's violations.  *See S.E.C. v. Fowler,* 6 F.4th 255, 264-65 (2d Cir. 2021) (affirming district court's discretionary decision to count each defrauded customer as a separate violation when calculating the civil penalty); *S.E.C. v. Glantz,* 94 CV 5737(LAP), 2009 WL 3335340, at *6 (S.D.N.Y. Oct. 13, 2009) (imposing the statutory civil penalty for each of the defendant's two victims); *S.E.C. v. Kenton Capital, Ltd.,* 69 F. Supp. 2d 1, 17 & n.15 (D.D.C. 1998) (imposing a civil penalty amount that was calculated by "multiplying the maximum third tier penalty for natural persons . . . by the number of persons who actually sent money to [defendant] . . . .").  Defendant's violations of the Adviser's Act caused Greeley and Trepp to suffer "substantial losses."  15 U.S.C. § 80b-9(e)(2)(C).  The evidence showed that Greeley lost $250,000.  Trepp lost $104,080, which was forty-five percent of the trust assets on which he relied to support himself.  Because a per victim penalty would effectuate the purpose of the statute, the court orders Defendant to pay $414,366 in civil penalties.

V.     FINAL JUDGMENT

Pursuant to the court's determination that Defendant violated Section 206(1) and Section 206(2) of the Advisers Act (Dkt. No. 66), and upon consideration of the SEC's Motion for Remedies (Dkt. No. 71), the court allows the SEC's motion as set forth herein.  A separate final

judgment will enter.  Following entry of judgment, the Clerk's Office is directed to close this

case on the court's docket.

It is so ordered.

Date:  March 30, 2022                          /s/ Katherine A. Robertson
                                               KATHERINE A. ROBERTSON
                                               U.S. MAGISTRATE JUDGE